UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ELIZABETH E. KRIER, | ) |
| | ) |
|     PLAINTIFF, | ) |
| | ) |
| vs. | )   CASE NO. 05-CV-475-FHM |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
|     DEFENDANT. | ) |

## ORDER

Plaintiff, Elizabeth E. Krier, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[1] In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Winfrey v. Chater*, 92 F.3d 1017 (10th Cir. 1996); *Castellano v. Secretary of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as

---

[1] Plaintiff's August 14, 2000 (protective date) application for Disability Insurance and September 21, 2000 application for Supplemental Security Income benefits were denied initially and upon reconsideration. A hearing before an Administrative Law Judge (ALJ) was held January 14, 2003. By decision dated June 16, 2003, the ALJ entered the findings which are the subject of this appeal. The Appeals Council denied review of the findings of the ALJ on June 23, 2005. The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir. 2003). The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Kelley v. Chater*, 62 F.3d 335, 337 (10th Cir. 1995); *Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *Hamilton v. Secretary of Health & Human Services*, 961 F.2d 1495 (10th Cir. 1992).

Plaintiff was born November 26, 1959, and was 43 years old at the time of the decision. [R. 18, 56]. She claims to have been unable to work since May 31, 2000, due to bilateral plantar fascitis, bilateral peripheral neuropathy and mental problems. [R. 80, 460, 480]. The ALJ determined that Plaintiff has been disabled since April 3, 2002. [R. 30]. He determined that prior to April 3, 2002, Plaintiff was able to perform her past relevant work (PRW) as an office assistant, thus determining at step four that Plaintiff was not disabled prior to that onset date. *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps of the evaluative sequence for determining whether a claimant is disabled).

Plaintiff asserts the ALJ incorrectly determined her onset disability period. [Plaintiff's Brief, p. 4]. For the reasons discussed below, the Court affirms the decision of the Commissioner.

### **Medical and Work History**

Because the onset date of Plaintiff's disability due to mental impairment is the sole issue raised upon appeal, the Court addresses only the medical evidence relating to Plaintiff's depression and anxiety.

2

Medical records as far back as 1994 document Plaintiff's long-standing history of post-traumatic stress disorder, depression and anxiety. [R. 116-129, 292, 345-351, 355, 360-368]. After a series of hospitalizations during 1996, Plaintiff received psychiatric treatment at Parkside Community Psychiatric Hospital through 1998. [116-131].

Plaintiff attended Langston Nursing School full-time between May 1996 and February 2000, and obtained her license as a registered nurse. [R. 454, 457]. After graduation from nursing school, she worked as an immunization nurse for the county health department until May 2000. [R. 454, 457].

Plaintiff received counseling at Family and Children's Services from July 2000 to November 2000. [R. 170]. During this time she was also seen at Oklahoma State University Health Care Center for a variety of physical complaints. [R.171-182]. Depression was frequently included in the lists of diagnoses and Zoloft [2] was identified in her lists of medications. [R. 171, 175, 181]. Plaintiff was also seen by a neurologist in August 2000 who suggested increasing Plaintiff's dosage of Elavil[3] for relief of small fiber neuropathy symptoms if her physicians at Parkside[4] agreed it was safe to do so. [R. 145]. From December 2000 to December 2001, Plaintiff was seen and treated for physical ailments at

---

[2] Zoloft is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder. It is also used to relieve the symptoms of premenstrual dysphoric disorder, including mood swings, irritability, bloating, and breast tenderness. MedlinePlus Drug Information on line: http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697 048.html.

[3] Elavil is an antidepressant and may be used for other conditions as determined by the doctor. MedlinePlus Drug Information on line: http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202055.html

[4] The dates of treatment in the records from Parkside, OSU Medical Clinic and Family and Children's Services sometimes run concurrently but it does not appear that Plaintiff was receiving mental health treatment during this time other than renewal of prescription medication.

the OSU Health Center. [R. 294-339]. Although depression was frequently noted among Plaintiff's illnesses, no complaints related to her mental condition were documented.

Plaintiff underwent a psychological evaluation by Minor W. Gordon, Ph.D. on February 7, 2001. [R. 230-232]. He reviewed Plaintiff's medical records and examined Plaintiff and diagnosed post traumatic stress disorder, anticipated to diminish in time and adjustment disorder with depressed mood, mild to moderate, secondary to Plaintiff's general medical condition. [R. 231].

On August 31, 2001, Plaintiff's neurologist, Michael Karathanos, M.D., reported a history of depression and possible "nervous break-down" but that Plaintiff had been in fairly good health. [R. 344]. Dr. Karathanos saw Plaintiff twice more before April 3, 2002, the disability onset date determined by the ALJ, for neuropathy complaints and he did not mention any depression related problems. [R. 343]. After Plaintiff's hospitalizations in April, May and July 2002, Dr. Karathanos' treatment records reflect neuropathic symptoms were unchanged but complaints of decreased memory and concentration caused by depression and multiple medications were recorded on August 20, 2002 and October 23, 2002. [R. 341, 342].

The record contains a March 19, 2002 Parkside Progress Note indicating Plaintiff was seen for treatment of mental health problems and was discharged to Family and Children's Services because "that is where her therapist is she has seen for years." [R. 293]. On April 3, 2002, Plaintiff was admitted to Parkside Community Psychiatric Hospital with major depressive episode, severe without psychotic features, panic disorder without agoraphobia, post traumatic stress disorder, borderline personality disorder and a GAF

score of 20.[5] [R. 283-285]. She was discharged home to self care on April 9, 2002, with instructions to follow-up in outpatient services at Family and Children's Services. [R. 279-282]. On April 11, 2002, Plaintiff was readmitted to the Parkside Hospital with a GAF score of 35. [R. 276-278]. She was discharged on April 12, 2002. to begin outpatient follow-up care at Parkside on April 15, 2002. [R. 273-275]. On April 22, 2002, Plaintiff was again admitted for one day and when discharged, was encouraged to seek employment. [R. 263-271]. Plaintiff was twice readmitted to Parkside in July, 2002, with a GAF score of 28. [R. 255-262].

The record contains a Mental Residual Functional Capacity Assessment (Mental RFC) form signed by Mark Medlin, M.D. and Angie Benham, Ph.D. on February 25, 2003, and a Psychiatric Review Technique (PRT) form signed by Dr. Medlin on March 17, 2003. [R. 369-380]. In all of the categories on the Mental RFC Plaintiff was checked as either moderately limited or markedly limited. [R. 369-371]. On the PRT form, Dr. Medlin checked marked limitations for the first three areas in the "B" criteria and he checked "repeated (three or more) times" under episodes of deterioration. [R. 379].

## Discussion

The ALJ concluded the medical record reflects Plaintiff's mental impairments of depression and anxiety were controlled with medication during the period between May 2000 and April 2002. The record supports this determination. Plaintiff was seen

---

[5] A global assessment of functioning (GAF) score is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning. A GAF score of 20 reflects some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute). American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000) (DSM-IV-TR).

regularly by health care providers during that time period and no symptoms of depression and anxiety so severe as to interfere with her ability to perform work activities were reported. Dr. Gordon's assessment of Plaintiff's depression on February 7, 2001, was mild to moderate. [R. 231]. There is no evidence in the medical treatment record demonstrating that this condition changed prior to April 3, 2002. The initial hospitalization summaries from Parkside in April 2002 indicate Plaintiff's GAF score for the past year was 55 or 60.[6] [R. 267, 270, 274, 278, 282, 285].

Plaintiff relies upon the dates written in at the top of the Mental RFC and the PRT forms fully three years later for her contention that her disability commenced on May 31, 2000. Dr. Medlin's opinion as Plaintiff's treating physician is certainly relevant in assessing Plaintiff's condition at the time he treated her.[7] However, the date written in at the top of the checklist forms for the time period covering his assessment, without supporting clinical evidence from the time period is not sufficient to establish disability. *See Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir.1987) (report consisting solely of boxes checked on the Commissioner's form to indicate conclusion of limitations, standing alone, unaccompanied by thorough written reports or persuasive testimony is not substantial evidence). While an ALJ is required to give the opinion of a treating physician controlling weight if it is both well-supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with other substantial evidence in

---

[6] A GAF score of 51-60 indicates moderate symptoms, such as a flat affect, or moderate difficulty in social or occupational functioning. (DSM-IV-TR (4th ed. 2000)).

[7] Plaintiff was referred to Dr. Medlin by the counselor at Family and Children's Services on March 19, 2002. [R. 293].

the record, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight. See *Watkins v. Barnhart*, 350 F.3d 1297 (10th Cir. Dec. 2, 2003). Apart from the assessment dates written in on the Mental RFC and PRT forms, nothing in the record supports Plaintiff's contention that her disability commenced on May 31, 2000. Because that notation is neither supported by the record nor consistent with the medical evidence, it does not serve as substantial evidence to support Plaintiff's contention.

Conversely, the record does contain substantial evidence supporting the ALJ's finding that Plaintiff was not disabled prior to April 3, 2002. At the hearing on January 14, 2003, Plaintiff testified that she was looking for jobs and going on interviews up until a year before the hearing. [R. 480]. She stated her condition got "worse" then, that she became more depressed, that she had episodes of feeling suicidal and "had to go inpatient at Parkside." [R. 481]. See *Glenn v. Shalala*, 21 F.3d 983, 987-88 (10th Cir.1994) (despite existence of evidence contrary to ALJ's finding, appellate court must affirm if, "considering the record as a whole, including whatever fairly detracts from the findings, there is sufficient evidence which a reasonable mind might accept as adequate to support a conclusion" (citation, further quotation omitted)). Plaintiff's allegation that the ALJ incorrectly determined her onset disability period is without merit.

## Conclusion

The Court finds the record as a whole contains substantial evidence to support the determination of the ALJ that Plaintiff did not meet the definition of disability as set forth within the Social Security Act prior to April 3, 2002. Accordingly, the decision of the Commissioner is AFFIRMED.

SO ORDERED this <u>31st</u> day of October, 2006.

*Frank H. McCarthy*
FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE